UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------X

Jose Dorance Florez,

                    Petitioner,          07-CV-4965 (CPS)

    - against -

                                      MEMORANDUM OPINION
United States of America,           AND ORDER

                    Respondent.

-----------------------------------------X

SIFTON, Senior Judge.

Petitioner Jose Dorance Florez was convicted in 2005 before the undersigned of conspiracy to import one kilogram or more of heroin into the United States in violation of 21 U.S.C. §§ 963, 960(a)(1), 960(b)(1)(A), and of conspiracy to possess with intent to distribute one kilogram or more of heroin in violation of 21 U.S.C. §§ 846, 841(a)(1), 841(b)(1)(A)(i).[1] On May 12, 2005, petitioner was sentenced to two concurrent incarceratory terms of 210 months, which he is presently serving, as well as two concurrent five-year terms of supervised release, and a special assessment of $200. Petitioner now moves *pro se* to vacate, set aside, or correct his conviction pursuant to 28 U.S.C. § 2255,

---

[1] On January 30, 2004, petitioner was charged with four narcotics-related crimes: (1) conspiracy to import one kilogram or more of heroin into the United States, in violation of 21 U.S.C. §§ 963, 952(a), 960(a)(1), 960(b)(1)(A); (2) importation one kilogram or more of heroin into the United States, in violation of U.S.C. §§ 952(a), 960(a)(1), 960(b)(1)(A); (3) conspiracy to possess with intent to distribute one kilogram or more of heroin, in violation of 21 U.S.C. §§ 846, 841(a)(1), 841(b)(1)(A)(I); and (4) possession with intent to distribute one kilogram or more of heroin, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(I). After a jury trial, petitioner was found guilty of only the first and third charges.

raising the following claims: (1) that he is actually innocent of the offenses; (2) that the government knowingly presented perjured testimony at trial; (3) that the government suppressed evidence in violation of its obligations under *Brady v. Maryland*, 373 U.S. 83 (1963) and *Giglio v. United States*, 405 U.S. 150 (1972); and (4) that he received ineffective assistance of counsel in violation of the Sixth Amendment to the Constitution of the United States. For the reasons set forth below, petitioner's application is denied.

## BACKGROUND

The following facts are drawn from the record of petitioner's criminal case and the parties' submissions in connection with this petition.

Petitioner's conviction originates in interrelated conspiracies to import heroin from Colombia into the United States for distribution. Throughout the duration of the conspiracies, petitioner was employed intermittently by Koppers Chocolate Factory in lower Manhattan, New York, owned and operated by Jeff Alexander. Transcript of May 12, 2004 Hearing ("Hr'g.") at 10, 20. Petitioner initiated these criminal conspiracies by proposing to his brother, Jose Maria "Chepe" Florez ("Chepe"), that they invest money Chepe received in 1997 from a settlement of a personal injury case in a heroin

importation and distribution enterprise. Trial Transcript ("Tr.") at 390.

In approximately February 1997, petitioner and Chepe recruited Pedro Villagomez, Chepe's brother-in-law, as a heroin smuggler. Tr. 539. In late February 1997, after having been supplied with tickets by Chepe,[2] Villagomez flew with petitioner from New York to Pereira, Colombia. Villagomez and petitioner traveled on the same flight and sat together; in Pereira, they stayed together at petitioner's girlfriend's home. Tr. 550. In Pereira, petitioner provided Villagomez with several aerosol cans (which originally contained hair spray, shaving cream, or deodorant) and a bottle of cologne, each filled with heroin, for transport back to New York. Tr. 551.

Petitioner then instructed Villagomez how to smuggle the drugs into the United States. Tr. 551. Larger aerosol cans were emptied and a smaller, traveler's-size vial was attached to the outlet so that the can would function properly if tested. The remainder of the cans were filled with heroin (and, often for the trip to South America, with money) and the bottom reattached so as to appear as originally sealed. Petitioner matched the weight of the heroin-filled cans to the weight listed on the cans'

---

[2] For each heroin-smuggling trip to South America, Chepe purchased the airline tickets, or otherwise arranged for the couriers to purchase the tickets, from various travel agencies located on Roosevelt Avenue in Queens, New York, including Delgado Travel and Costamar Travel. Tr. 320-21, 346, 357, 365, 549.

original packaging to avoid suspicion in case of inspection, and ensured that each can contained less than a kilogram of heroin in order to avoid stiffer penalties if detected. Tr. 159, 163, 339-40, 552.

On March 2, 1997, Villagomez arrived at JFK International Airport in Queens, New York, with heroin, passed through customs, and delivered the cans to Chepe. Villagomez received payment from Chepe soon thereafter. Tr. 547-54.

Villagomez repeated this trip in March or April 2007, but this time avoided flying directly between the United States and Colombia (as a "high profile country") by traveling to Colombia via Ecuador. Tr. 563. Villagomez flew first to Quito, Ecuador, then traveled by bus from Quito to Pereira, Colombia, where he again met with petitioner. On this trip, Villagomez visited petitioner's *finca* on the outskirts of Pereira. Tr. 570. As before, petitioner supplied Villagomez with four heroin-filled cans, and provided instructions regarding the return trip to New York. Tr. 565-66. En route from Colombia to Ecuador, the bus was stopped and inspected at a military checkpoint; Villagomez was removed from the bus, but the cans successfully passed testing. Tr. 566-67. Villagomez continued on to Quito, from where he again flew into JFK, went through customs, delivered the heroin to Chepe, and, some days later, received approximately $10,000 for his services. Tr. 568-70.

In April 2007, Villagomez proposed forming his own smuggling cell in Ecuador as part of the ongoing heroin importation scheme. Petitioner and Chepe agreed. Tr. 573. Villagomez enlisted his cousin, Serge Zavala, who then recruited Mauricio Funes, Michael Garcia, and David Blakis as couriers. Villagomez traveled ahead of the couriers to Ecuador, organized the couriers there, and then continued on to Colombia to make arrangements with petitioner to obtain heroin. After meeting with petitioner, Villagomez returned to Ecuador, where, pursuant to petitioner's instructions, he retrieved luggage containing concealed heroin. Villagomez then arranged for both Funes and Garcia to travel back to New York. Tr. 574-79.

While Villagomez established his operation in Ecuador, Chepe recruited Miguel Pavez, who was at the time dating petitioner's 16-year-old niece, Tr. 294, 315, 336-37, to import heroin into New York from Colombia using the model successfully employed with Villagomez. Tr. 294-95. Chepe supplied Pavez with travel arrangements and expenses and instructed him to deliver $10,000 in cash to petitioner, who would then supply Pavez with concealed heroin for the return trip to New York. Tr. 320-21. On approximately May 14, 1997, Pavez few to Pereira, Colombia, met with petitioner, and exchanged the cash for several aerosol cans containing heroin. Tr. 338-40. Pavez flew from Colombia to Chile, and then from Chile to New York, where he delivered the cans to

Chepe. Within a few weeks, Chepe paid Pavez approximately
$10,000. Tr. 340-42.

Pavez subsequently offered his friend Rodrigo Deschamps a
part in the heroin smuggling scheme. Deschamps agreed. Tr. 144-
45. Some weeks later, in June 1997, Pavez called Deschamps and
instructed him to meet at Chepe's apartment in Queens, New York.
Tr. 145-46. Chepe supplied Pavez and Deschamps with airline
tickets to Quito, Ecuador, as well as numerous empty aerosol cans
to bring to Colombia, and again entrusted Pavez with $10,000 for
petitioner. Tr. 147-49, 345-46. Pavez and Deschamps flew to Quito
and took a bus to Pereira, Colombia, where they were met by an
associate of petitioner named La Chusca, who drove Pavez and
Deschamps to a meeting with petitioner. Tr. 149-53. During their
stay in Colombia, Pavez and Deschamps stayed with members of the
Florez family and visited petitioner's ranch. Tr. 54-155, 350.

Over the course of his time in Pereira, Deschamps overheard
two conversations between La Chusca and petitioner related to the
narcotics-smuggling conspiracy. During the first conversation
petitioner arranged to take the empty cans from La Chusca to be
packed with heroin. In a later conversation, petitioner informed
La Chusca that the completed cans were ready for transport. Tr.
193-95, 155-62. Pavez and Deschamps were thereafter supplied with
eight heroin-filled cans. Tr. 349.

During their return bus trip to Quito, Pavez was inspected

by local authorities without incident. On approximately June 11, 1997, Deschamps and Pavez flew into JFK from Quito, successfully passed through customs, and delivered the heroin-filled cans to Chepe, who later paid them a total of $20,000. Tr. 163-66, 351-54.

In July 1997, Chepe directed Pavez to establish a smuggling cell in Santiago, Chile, Tr. 356-58, mirroring Villagomez's activity in Ecuador. Pavez traveled to Chile, and there recruited two friends named Rojas and Soto to transport the heroin from Colombia to Chile. Tr. 357-59, 431. At the same time, Chepe sent between $10,000 and $20,000 in cash and numerous aerosol cans with Deschamps to Chile, where Pavez retrieved them. After the new couriers brought the cans filled with heroin back from Colombia to Chile, Pavez and Deschamps returned with of eight cans to New York through JFK, passed through customs, and delivered the cans to Chepe. Tr. 170-77, 360-61. After spending that night at Chepe's apartment, located in the same building as petitioner's apartment, Deschamps overheard petitioner and Chepe discussing the heroin importation scheme and praising Deschamps' services as a courier. Tr. 177-78. Some days later, Chepe paid Deschamps approximately $7,000. Tr. 179.

Later in July 1997, Pavez returned to Chile with two new acquaintances-turned-couriers, Leonardo Toledo and Alfredo Schubert. Tr. 363-65. In Chile, they met with Pavez's brother and

a Florez family friend, who supplied them with eight heroin-filled aerosol cans. Tr. 365-67. On August 3, 1997, Toledo successfully brought four cans from Chile to New York. On August 5, 1997, Schubert, accompanied by four heroin-filled cans, was arrested at JFK trying to clear customs. Pavez's mother, Sylvia Fuentes, attempting to pick up Schubert at her son's request, was also arrested at the airport. Tr. 369-71, 503. Thereafter, Pavez returned from Chile to New York. Tr. 372.

By this time, Villagomez had mobilized his Ecuador-based smuggling cell. On approximately August 6, 1997, Funes entered New York undetected; Zavala confirmed Funes' success to Villagomez, retrieved the luggage, and delivered it to Chepe. Tr. 579-80. On approximately August 8, 1997, Garcia was arrested entering the United States at JFK. Garcia agreed to participate with law enforcement in a controlled delivery of the heroin-filled luggage, leading to the arrests of Funes and Zavala. Tr. 582-583, 41-48, 51-53.

Later in August 1997, Pavez returned to Chile, and from there to Pereira, with $10,000 from Chepe. There, in response to the string of courier arrests in early August 1997, La Chusca arranged for two kilograms of heroin to be packaged in footwear and a Nintendo machine rather than aerosol cans. Pavez transported the heroin-filled footwear and game console to New York and delivered them to Chepe for approximately $30,000. Tr.

373-78.

After the arrests of Garcia, Funes, and Zavala in New York, Villagomez returned to New York to discuss the viability of the importation scheme with Chepe, who advised him to leave the United States. Villagomez flew to Montreal, Canada, then to Caracas, Venezuela, and finally to Colombia, where, at some time between September and October 1997, he again met petitioner in Pereira. Tr. 584-85. Villagomez lodged with petitioner's family, and at some point reviewed with petitioner the legal complications related to the collapsing importation scheme. Tr. 585-86. In October 1997, petitioner again arranged for Villagomez to transport heroin into the United States, this time by stitching it into packed articles of clothing rather than packing it into aerosol cans. Tr. 586. Villagomez traveled to Guayaquil, Ecuador, and from there flew to Houston, Texas, where he was arrested on November 1, 1997. Tr. 586-87, 591.

In late November 1997, Deschamps agreed to a final heroin run. Tr. 183. Promised $13,000 by Chepe, who again arranged his travel plans, Deschamps flew to Santiago, Chile, and from there to Pereira, Colombia. Tr. 183-84. As before, Deschamps met with La Chusca, who provided him with sneakers packed with heroin. Tr. 184-88. Deschamps returned from Colombia via Chile to New York, eventually delivering the heroin to Chepe's apartment. Tr. 188-90. There, Chepe and Pavez extracted the heroin from the

sneakers, repackaged it in Ziploc bags, and conveyed it to an
unnamed party. Tr. 381-84.

Ultimately, Pavez was arrested in Miami, Florida, and Chepe
in New York, on June 10, 1998. Hr'g. 7-9, Tr. 445-47. Deschamps
was arrested later in the summer of 1998. Tr. 124. On December
21, 1998, Chepe pled guilty to one count of conspiracy to import
heroin into the United States, in violation of 21 U.S.C. § 963.
On July 28, 1999, he was convicted on his guilty plea, benefitted
from a departure below the Sentencing Guideline range, and was
sentenced to the statutory minimum of 120 months' imprisonment
followed by a five-year term of supervised release. *Florez v.
U.S.*, No. CV-00-5073 (DGT), 2007 WL 162764, (E.D.N.Y. Jan. 18,
2007). Chepe was released from custody on February 23, 2007.[3]

After his brother's arrest, petitioner fled to avoid
prosecution, and between June 1998 and April 2001, petitioner
remained in Colombia. Hr'g. 10-15, 43-46, 98-99. By April 2001,
petitioner returned to New York, and endeavored to evade
detection by law enforcement officials between April 2001 and May
2003 by using the address and banking information of an
acquaintance, Girleza Silva, to renew his drivers licence,
deposit a check for $13,000, and subsequently withdraw cash.
Hr'g. 57-59, 98-102, 104-10. Concurrently, law enforcement

_____

[3] *See* Federal Bureau of Prisons, *available at*
http://www.bop.gov/iloc2/InmateFinderServlet?Transaction=NameSearch&needingMor
eList=false&FirstName=jose&Middle=&LastName=florez&Race=U&Sex=M&Age=&x=82&y=14
(last visited Jun. 10, 2009).

officials continued their investigation of petitioner by questioning witnesses to the heroin conspiracy, surveilling petitioner's addresses, known whereabouts, and associates, and employing the NCIC and TECS tracking databases.[4] Tr. 43-44, 50-54, 57-59. Petitioner was eventually arrested re-entering the United States in Miami in January 2004.

Petitioner was indicted on January 30, 2004. I subsequently denied petitioner's motion to dismiss on statute of limitations grounds, concluding that "[petitioner] fled shortly after his brother's arrest and thereafter concealed himself for a number of years for the sole purpose of avoiding prosecution." Transcript of Pretrial Proceedings on June 23, 2004 ("P. Tr.") at 19. As such, the government met its burden in establishing petitioner's intentional fugitive status, thus tolling the applicable five-year statute of limitations. P. Tr. at 19.

At trial, in July 2004, the government presented three cooperating witnesses, Deschamps, Pavez, and Villagomez, whose testimony was substantially consistent regarding the importation scheme and petitioner's role in it. The government also offered

---

[4] NCIC (National Crime Information Center) is a national law enforcement database used to track individuals wanted by various law enforcement agencies. TECS (Treasury Enforcement Communication System) is a database system used to monitor individuals who enter the United States through ports of entry. Tr. 61-64.

documentary evidence that corroborated the testimony.[5] Petitioner attacked the credibility of the cooperating witnesses and argued that the government failed to present sufficient evidence to establish petitioner's guilt beyond a reasonable doubt.

At the conclusion of the jury trial, on July 7, 2004, the jury returned a verdict of guilty as to the two narcotics-related conspiracy counts, conspiracy to import one kilogram or more of heroin and conspiracy to possess with intent to distribute that same quantity of heroin. On February 23, 2005, I denied petitioner's motion for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29. On May 12, 2005, petitioner was sentenced to two concurrent incarceratory terms of 210 months, as well as two concurrent five-year terms of supervised release, and a special assessment of $200.

Petitioner appealed his conviction and sentence to the United States Court of Appeals for the Second Circuit on the grounds that "(1) the charges against him [were] time-barred, (2) the record evidence [was] legally insufficient to support his conviction, and (3) his incarceratory sentence [was] (a) based on

_____

[5] The government's evidence included certifications from employees at Costamar Travel and Delgado Travel, both located in Queens, New York, which included documentation recorded in the ordinary course of business relating to the purchasing of airline travel for the couriers engaged in petitioner's heroin-importation and distribution conspiracies. Tr. 645-49. The government also introduced travel documents, a certification by an employee of Lan Chile Airlines, and testimony by an employee of Avianca Airlines, regarding travel documents such as tickets and passenger manifests, germane to petitioner's and his couriers' airline travel in furtherance of the criminal conspiracies. Tr. 649-73.

impermissible judicial factfinding as to drug quantity and (b) unreasonably disproportionate to the ten-year prison term imposed on his brother for participation in the same conspiracies." *U.S. v. Florez*, 447 F.3d 145, 148 (2d Cir. 2006). On May 3, 2006, the Second Circuit denied the appeal, concluding that the statute of limitations was properly tolled as a result of petitioner's intentional flight from justice. *Id.* at 150-54. The Court further found that "three accomplice witnesses provid[ing] mutually corroborative direct evidence of the existence of the charged conspiracies and [petitioner's] membership in them" was sufficient to support petitioner's conviction. *Id.* at 155-56. Finally, the Court concluded that this Court made a proper determination as to the drug quantity and imposed a reasonable sentence, despite the sentencing disparity between petitioner and his brother. *Id.* at 158.

The Supreme Court of the United States denied certiorari on November 13, 2006. *Florez v. U.S.*, 549 U.S. 1040 (2006). Petitioner filed the instant motion on November 26, 2007.

## DISCUSSION

In this petition to vacate, set aside, or correct petitioner's conviction pursuant to 28 U.S.C. § 2255[6], petitioner

---

[6] 28 U.S.C. § 2255 states in relevant part that:
  (a) A prisoner in custody under sentence of a court
  established by Act of Congress claiming the right to be

claims (1) actual innocence as to the convicting offenses; (2) that the government knowingly presented perjured testimony at trial; (3) that the government suppressed evidence in violation of its obligations under *Brady v. Maryland*, 373 U.S. 83 (1963) and *Giglio v. United States*, 405 U.S. 150 (1972); and (4) that petitioner received ineffective assistance of council in violation of the Sixth Amendment to the Constitution of the United States.

## I. Standard for § 2255 Motion

In bringing a motion under § 2255, petitioner must demonstrate either a constitutional or jurisdictional error, or a "fundamental defect which inherently results in a complete miscarriage of justice." *Hill v. U.S.*, 368 U.S. 424, 428 (1962); *see also McCleskly v. Zant*, 499 U.S. 467, 496 (1991). Additionally, in 1996, Congress amended 28 U.S.C. § 2255 to include a one-year statute of limitations period that runs from, at the earliest, the date on which the judgment of conviction becomes final.

---

released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence. (b) Unless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall cause notice thereof to be served upon the United States attorney, grant a prompt hearing thereon, determine the issues and make findings of fact and conclusions of law with respect thereto.

Generally, a § 2255 proceeding may not be used to re-litigate questions that were raised and considered on direct appeal, with limited exceptions, such as when there has been an intervening change in the law. *Davis v. U.S.*, 417 U.S. 333, 342 (1974). Moreover, movants are procedurally barred from bringing claims which could have been, but were not, raised on direct appeal unless they can show both cause for the failure to raise the claim at the proper time and actual prejudice resulting from the errors raised. *U.S. v. Frady,* 456 U.S. 152, 168 (1982); *see also Bousley v. U.S.*, 523 U.S. 614, 621-22 (1998); *Massaro v. U.S.*, 538 U.S. 500, 504 (2003) ("The general rule [is] that claims not raised on direct appeal may not be raised on collateral review unless the petitioner shows cause and prejudice."). Absent these restrictions, Section 2255(b) requires an evidentiary hearing where the facts alleged, if not conclusively disproved by the record, and if true, would entitle the movant to collateral relief. *Armienti v. U.S.*, 234 F.3d 820, 823 (2d Cir. 2000); *see also Ciak v. U.S.*, 59 F.3d 296, 306-307 (2d Cir. 1995) (holding that a hearing should be granted where "[p]etitioner alleged facts, which, if found to be true, would have entitled him to habeas relief"); *Fontaine v. U.S.*, 411 U.S. 213, 215 (1973) (holding that where the record does not "conclusively show that under no circumstances could the petitioner establish facts warranting relief under § 2255" a

hearing must be afforded.).[7]

## II. Timeliness of Petition

Petitions under § 2255 must be brought, at the latest, one year from the date at which the judgment of conviction becomes final. Within the context of collateral review, "finality attaches when [the Supreme Court] affirms a conviction on the merits on direct review or denies a petition for a writ of certiorari, or when the time for filing a certiorari petition expires." *Clay v. U.S.*, 537 U.S. 522, 527 (2003). The Second Circuit has extended the "prison mailbox rule" to petitions for writs of habeas corpus, including § 2255 motions, such that "a prisoner appearing *pro se* satisfies the time limit for filing a notice of appeal if he delivers the notice to prison officials within the time specified." *Noble v. Kelly*, 246 F.3d 93, 97 (2d Cir. 2001), *cert. denied*, 534 U.S. 886 (2001) (citing *Houston v. Lack,* 487 U.S. 266 (1988)).

In this case, since the Supreme Court denied certiorari on November 13, 2006, *Florez v. U.S.,* 549 U.S. 1040 (2006), the one-year limitation on postconviction relief under § 2255 began on that date. Petitioner filed the instant motion on November 26,

---

[7] "The Supreme Court has held that, although a hearing may be warranted, that conclusion does not 'imply that a movant must always be allowed to appear in a district court for a full hearing if the record does not conclusively and expressly belie his claim, no matter how vague, conclusory, or palpably incredible his allegations may be.'" *Chang v. U.S.*, 250 F.3d 79, 85 (2d Cir. 2001). The Court may therefore fully investigate allegations of fact outside the record by choosing a middle road between summarily dismissing the petitioner's claim and holding a full testimonial hearing. *Id.* at 86.

2007, 13 days beyond the expiration of the statute of limitations. Nevertheless, since there is no evidence that petitioner, appearing *pro se*, did not deliver the petition to prison authorities for mailing at the time he executed it, on November 9, 2007, in light of the "prisoner mailbox rule," I deem the instant petition timely.

III. Petitioner's Claims for Relief

A. Actual Innocence

Petitioner claims he is actually innocent of the crimes of which he was convicted. Actual innocence is not in it of itself a claim for relief; rather, a showing of actual innocence serves as a "gateway" for a petitioner to argue a procedurally defaulted issue. *House v. Bell*, 547 U.S. 518, 555 (2006). Even where a § 2255 petitioner is unable to establish cause and prejudice sufficient to lift the procedural bar on bringing claims which could have been, but were not, raised on direct appeal, he may obtain review of his constitutional claims if he falls within the "narrow class of cases... implicating a fundamental miscarriage of justice," *McKlesky*, 499 U.S. 467, 493-94 (1991), by demonstrating actual innocence as to the convicting crime. *Schlup v. Delo*, 513 U.S. 298, 315-17 (1995); *see also Dunham v. Travis*, 313 F.3d 724, 730 (2d Cir. 2002).[8] While "claims of actual

[8] The fundamental miscarriage of justice exception, tied explicitly to the petitioner's actual innocence, *Schlup*, 513 U.S. at 321, "seeks to balance the societal interests in finality, comity, and conservation of scarce judicial resources with the individual interest in justice that arises in the

innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation," *U.S. v. Quinones*, 313 F.3d 49, 67 (2d Cir. 2002)*, cert. denied*, 540 U.S. 1051 (2003) (quoting *Herrera v. Collins*, 506 U.S. 390, 400 (1993)), "if the habeas court were merely convinced that those new facts raised sufficient doubt about [the petitioner's] guilt... [a] *threshold showing of innocence* would justify a review of the merits of the constitutional claims." *Schlup*, 513 U.S. at 317 (emphasis added).

"'Actual innocence' means factual innocence, not mere legal insufficiency." *Bousley v. U.S.,* 523 U.S. 614, 623 (1998). Thus, while "absolute certainty about the petitioner's guilt or innocence is not required," *House*, 547 U.S. at 537, to satisfy the actual innocence gateway standard, petitioner must show that, "in light of all the evidence...it is more likely than not that no reasonable juror would have" found the defendant guilty "beyond a reasonable doubt."[9] *Schlup*, 513 U.S. at 327-328; *see also Dunham,* 313 F.3d at 730.

Accordingly, in order to demonstrate actual innocence,

---

extraordinary case." *Schlup,* 513 U.S. at 324.

[9] While *Schlup* makes clear that in determining whether a hearing is required a court consider *all* the evidence, it also holds that the court should nevertheless look "*primarily* to the affidavit or other evidence proffered in support of the application in order to determine whether, if the evidence should be offered at a hearing, it would be admissible proof entitling the petitioner to relief." *LoCascio v. U.S.*, 395 F.3d 51, 57 (2d Cir. 2005)(quoting *Dalli v. U.S.*, 491 F.2d 758, 760 (2d Cir. 1974)) (emphasis added).

"petitioner must make a stronger showing than is required to establish prejudice under an ineffective assistance claim."[10] *Dunham,* 313 F.3d at 730; *see Schlup*, 513 U.S. at 327. At the same time, since this probabilistic 'reasonable juror' standard "focuses the inquiry on the likely behavior of the trier of fact,... newly presented evidence may indeed call into question the credibility of [evidence] presented at trial." *Schlup*, 513 U.S. at 330. While an assessment of the petitioner's evidentiary showing "is not bound by the rules of admissibility that would govern at trial," *Schlup* at 327-328, the application must "contain assertions of fact that a petitioner is in a position to establish by competent evidence." *Haouari v. U.S.*, 510 F.3d 350, 354 (2d Cir. 2007) (citing *U.S. v. Aiello*, 814 F.2d 109, 113 (2d Cir. 1987)); *see also Dalli v. U.S.*, 491 F.2d 758, 760-761 (2d Cir. 1974). Accordingly, "airy generalities, conclusory assertions and hearsay statements will not suffice." *Aiello*, 814 F.2d at 113.

Here, petitioner claims that his 'new evidence' not only conflicts with the trial testimony of the three cooperating witnesses, but unequivocally disproves their testimony as to his guilt, consequently establishing his innocence. Specifically,

---

[10] The "standard for prejudice... requires only a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Schlup*, 513 U.S. at 332-33 (O'Connor, J., concurring) (citing *Strickland v. Washington*, 466 U.S. 668, 695 (1984)).

petitioner relies on his own signed and sworn statement that he
is innocent of participation in any illegal conspiracy, two
similarl affidavits from his brother Chepe denying petitioner's
complicity in the heroin-trafficking scheme,[11] and his work
records from Koppers Chocolate Factory.[12] Petitioner's Brief
("Pet'r. Br."), 13. Petitioner also asserts that this new
evidence, part of which was allegedly suppressed by the
government at trial, conflicts with the testimonies of the
cooperating witnesses.[13] Pet'r. Br. 10.

---

[11] Petitioner submitted two affidavits from Chepe as Attachment A to the
present motion. The first, dated November 16, 2005, conclusorily exculpates
petitioner from the narcotics-related conspiracies which Chepe admits
supervising (while dismissing the inculpatory testimony of the three
cooperating witnesses without explanation). The second, dated October 24,
2007, prefaces the same content with a claim that Chepe made known his desire
to testify to that effect on petitioner's behalf to both petitioner's defense
attorney and the government.

[12] Petitioner includes two substantively identical Attachments, B and F,
considered here as 'employment records.' The first attachment, an affidavit
from Jeff Alexander, owner and operator of Koppers Chocolate, lists
petitioner's employment attendance records kept by Mr. Alexander in the normal
course of business. The second attachment reproduces the 'Absentee Calendar'
and payroll information from which Mr. Alexander assembled petitioner's
attendance records.

[13] Petitioner has also appended, as Attachment C, an unsigned 'Proffer
Agreement' between the government and Chepe which bears no relevance to any of
his claims. Appended as Attachment E are barely legible reproductions of
ticket information for petitioner on Avianca Airlines, indicating that
petitioner traveled between New York and Colombia in February, June-July, and
November 1997. None of the travel dates conflict, in any way, with the
testimony of the three cooperating witnesses or with any other evidence in
record.
        Petitioner also included three additional attachments, meant to
supplement his claim of actual innocence, in his reply to the government's
memorandum opposing his § 2255 motion: (1) an affidavit from petitioner's
wife, Mrs. Viviana Cardenas-Florez, (2) Colombian property records in
petitioner's name, and (3) a letter, dated May 24, 2005, from petitioner's
counsel D. Zapp to AUSA D. Wenner regarding petitioner's employment records.
Petitioner's Reply ("Pet'r. Rep."), Aug. 4, 2008, Attachments A-C. Arguments
raised or evidence supplied for the first time in a reply memorandum need not
be addressed. *See U.S. v. Gigante*, 39 F.3d 42, 50 n. 2 (2d Cir. 1994) ("These
arguments were raised for the first time in defendants' reply brief. Arguments

The 'new evidence' offered by petitioner does not alter the effect of the evidence substantiating his conviction by making it more likely than not that no reasonable juror would have found him guilty. First, the evidence presented at trial was legally sufficient to establish petitioner's guilt. "The law is well established that a federal conviction may be supported 'by the uncorroborated testimony' of even a single accomplice witness 'if that testimony is not incredible on its face and is capable of establishing guilt beyond a reasonable doubt.'" *U.S. v. Florez*, 447 F.3d 145, 155 (2d Cir. 2006), *cert. denied*, 549 U.S. 1040 (2006) (quoting *U.S. v. Parker*, 903 F.2d 91, 97 (2d Cir. 1990)). Furthermore, the record demonstrates the force of the totality of evidence against petitioner. Testimony and cross-examination of the cooperating coconspirators demonstrated substantial consistency and mutual corroboration between the witnesses, providing convincing evidence of petitioner's guilt. All three witnesses independently attested to the same methods of heroin-transportation and petitioner's role in the conspiracies,

---

may not be made for the first time in a reply brief."), vacated on other grounds and superseded in part on denial of reh'g, 94 F.3d 53 (2d Cir. 1996); *Keefe v. Shalala*, 71 F.3d 1060, 1066 n. 2 (2d Cir. 1995) ("We will not consider arguments raised for the first time in a reply brief."); *Concepcion v. U.S.*, 181 F.Supp.2d 206, 231 (E.D.N.Y. 2002) (stating, in adjudicating a habeas petition under § 2255, "it is well settled... that a party may not raise an argument for the first time in a reply brief."); *Ruiz v. U.S.*, No. CV-07-9461 (RMB), 2009 WL 564257, 12 (S.D.N.Y. Mar. 5, 2009) (noting, in adjudicating a petition pursuant to § 2255, that evidence produced for the first time in reply need not be addressed). In any event, none of the additional evidence appended to petitioner's reply substantively advances his claims.

including: the concurrent development of two separate but identical schemes, one routed through Ecuador and the other through Chile and Ecuador; petitioner's role in supplying the heroin and providing instructions regarding concealing the heroin in transit; and the simultaneous alterations to the smuggling schemes as separate couriers were arrested. They further recounted numerous details about petitioner in his role as heroin-importer, such as his domicile in New York and his *finca* in Pereira, Colombia. Indeed, the Second Circuit confirmed both the sufficiency and competence of the evidence supporting petitioner's guilt. *Florez*, 447 F.3d at 155, 158.

Petitioner presents no evidence that, even if true, would so overwhelm the record evidence as to prevent any reasonable juror from convicting him of criminal conspiracy. Petitioner's own claims of innocence are self-serving, uncorroborated, and conclusory. For example, petitioner admits that "there are two occasions on which [petitioner] was present in Pereira [sic], Colombia, while Villagomez, Pavez, and Deschamps all were present" but insists without supporting evidence that "on neither occasion did [petitioner] provide anything to them to bring into the United States, much less to say [sic] heroin." Pet'r. Br. 13 n.4. In essence, petitioner asks this Court to determine his actual innocence based on his word rather than on any new evidence and against sworn testimony subject to cross-examination

and upheld on appeal.

Chepe's statements are similarly unconvincing. Chepe attempts to exonerate his brother from any participation in the narcotics-related conspiracies by inculpating himself alone in that criminal activity, for which he faces no further penalty. Because Chepe's statements seek to exculpate his brother at no cost to himself and without any explanation refuting his co-conspirators' mutually corroborative testimony, no reasonable juror could credit Chepe's conclusory assertions to the point of acquitting petitioner in light of the substantial evidence against him. *Aiello*, 814 F.2d at 113.

Nor do Mr. Alexander's declaration and the attached employment records advance petitioner's claim of innocence. Even assuming *arguendo* that the government suppressed this evidence, petitioner's employment records neither undercut the testimony of the cooperating witnesses nor otherwise contradict the evidence against petitioner. Both the list of petitioner's work dates presented in Mr. Alexander's declaration and the matching 'Absentee Calendar' attached to the instant petition correspond precisely, with one potential exception,[14] to the dates on which

---

[14] The one potential conflict involves Villagomez's testimony concerning his last rendezvous with petitioner in Colombia which, according to Villagomez, occurred sometime between September and October 1997. Petitioner's employment records indicate that, with the exception of September 1, 1997, petitioner worked every weekday of September and October 1997. This attendance record does not establish, however, that Villagomez could not have met with petitioner in September or October of 1997. For example, Villagomez could have met with petitioner on September 1. Petitioner could also have met with

the record evidence places petitioner in Colombia. For example, just as Villagomez testified that he flew to Colombia with petitioner in late February 1997 and subsequently met with him in Colombia sometime between March and April 2007, petitioner's employment records show his absence from work on February 17, 19, and 24-26, 2007, March 1-15, 2007, and again on March 28, 2007. Likewise, Pavez and Deschamps reported meeting with petitioner in Colombia in June 1997; correspondingly, petitioner's employment records demonstrate his absence from work in New York beginning on May 8, 1997, through the entirety of June 1997, and until July 24, 1997. Rather than challenging his conviction, petitioner's work records reinforce the testimonial and documentary evidence against him. Thus, petitioner's employment records fail to raise a question as to the sufficiency of the evidence upon which the jury convicted him. Accordingly, petitioner's actual innocence claim fails.

B. Perjured Testimony

Petitioner next claims that the government knowingly presented perjured testimony leading to his conviction. Specifically, petitioner asserts that the evidence appended to the present petition discredits the testimony of the cooperating

---

Villagomez during any weekend in September and October 1997 as his work-log does not account for weekend activities. Finally, Villagomez may have been mistaken as to the precise time of the trip. Such an inconsistency would not suffice to sustain petitioner's claim of actual innocence. *see U.S. v. Gasmbino*, 59 F.3d 353, 365 (2d Cir. 1995).

witnesses and undercuts the government's arguments based on their testimony. Pet'r. Br. at 15-16.

As an initial matter, since petitioner did not raise this claim on direct appeal, he is procedurally barred from raising it here. Section 2255 may not be used to bring claims which could have been, but were not, raised on direct appeal unless the movant demonstrates both cause for the failure to raise the claim and resulting prejudice. *Massaro*, 538 U.S. at 504. Petitioner shows no such cause, nor is any evident. Therefore, petitioner is procedurally barred from raising the perjury claim in his § 2255 motion.

Regardless, petitioner's perjury claim fails on the merits. Perjury requires more than just showing a witness's testimony to be false - it must have been intentionally false as to a material matter. *U.S. v. Dunnigan*, 507 U.S. 87, 94-95 (1993) (citing 18 U.S.C. § 1621) ("A witness testifying under oath or affirmation [commits perjury] if she gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory."). Contradictory testimony or differences in recollection among witnesses does not alone amount to perjury. *U.S. v. Bortnovsky,* 879 F.2d 30, 33 (2d Cir. 1989); *see also U.S. v. Gallego,* 191 F.3d 156, 162 (2d Cir. 1999)*, cert. denied*, 530 U.S. 1216 (2000); *U.S. v. Sanchez*, 969 F.2d 1409, 1415 (2d Cir.

1992), *cert. denied*, 514 U.S. 1038 (1995). "Even a direct
conflict in testimony does not in itself constitute perjury."
*U.S. v. Gambino*, 59 F.3d 353, 365 (2d Cir. 1995), *cert. denied*,
517 U.S. 1187 (1996).

Where there is a demonstrated instance of perjury, "a new
trial is not foreordained." *U.S. v. Monteleone*, 257 F.3d 210, 219
(2d Cir. 2001), *cert. denied*, 535 U.S. 1070 (2002). Whether
perjured testimony results in a new trial depends on the
materiality of the perjury and the extent to which the
prosecution was aware of the perjury. *U.S. v. Wallach*, 935 F.2d
445, 457 (2d Cir. 1991), *cert. denied*, 508 U.S. 939 (1993).
"Where the prosecution knew or should have known of the perjury,
a new trial is warranted if there is any reasonable likelihood
that the false testimony could have affected the judgment of the
jury." *U.S. v. Wong*, 78 F.3d 73, 81 (2d Cir. 1996) (internal
quotations omitted). By contrast, where the government was
unaware of the witness's perjury, "a new trial is warranted only
if... the court [is left] with a firm belief that but for the
perjured testimony, the defendant would most likely not have been
convicted." *Monteleone*, 257 F.3d at 219; *see also Sanders v.
Sullivan*, 863 F.2d 218, 226 (2d Cir. 1988).

Here, petitioner fails to cast doubt on the truthfulness of
the cooperating witnesses' testimony or show it to be
intentionally false. As previously stated, the record

demonstrates substantial consistency and mutual corroboration between the testimony of the three cooperating witnesses. The veracity of this testimony is further supported by its having been subjected to cross-examination and appellate review. Moreover, as discussed above, petitioner's "new evidence" neither contradicts nor meaningfully conflicts with the evidentiary record.

Further, petitioner adduces nothing indicating that the government believed that the three cooperating witnesses' testimony constituted perjury. To the contrary, the government's belief that the witnesses testified truthfully is well supported by the record. *See* Tr. 789-94. Since petitioner fails to establish even a plausible claim of perjury, the government's purported knowledge of that perjury is moot.

Petitioner argues that an evidentiary hearing is required in order to resolve his perjury claim. An evidentiary hearing is necessary only where a petitioner establishes a "plausible claim" of perjury - one not plainly disproved by the totality of evidence and that, if true, would entitle him to collateral relief. *Armienti*, 234 F.3d at 823. Since petitioner has failed to establish a plausible perjury claim, an evidentiary hearing is not warranted.

C. Suppression of Evidence

Petitioner further claims that the government intentionally

withheld from him "two key pieces of favorable evidence," namely Chepe's testimony and petitioner's work records at Koppers Chocolate. Pet'r. Br. at 16. As with the perjury claim, the suppression of evidence claim is procedurally barred since petitioner failed to raise it on direct appeal. Likewise, this claim further fails on the merits.

Constitutional guarantees of due process require the government to notify the defense of any exculpatory evidence. *Brady v. Maryland*, 373 U.S. 83, 87 (1963) ("Suppression by the prosecution of evidence favorable to an accused... violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."). "There are three components of a true *Brady* violation: [1] The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching;[15] [2] that evidence must have been suppressed by the State, either willfully or inadvertently; and [3] prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 282 (1999).

While the *Brady* doctrine extends to evidence which the defense failed to request, *see U.S. v. Agurs*, 427 U.S. 97 (1976),

---

[15] *Giglio v. U.S.*, 405 U.S. 150, 154-15 (1972), "stands for the proposition that when the reliability of a given witness may be determinative of guilt or innocence, nondisclosure of impeachment material may be grounds for a new trial. Impeachment evidence is evidence 'having the potential to alter the jury's assessment of the credibility of a significant prosecution witness." *U.S. v. Madori*, 419 F.3d 159, 170 (2d Cir. 2005) (quoting *U.S. v. Avellino*, 136 F.3d 249, 255 (2d Cir. 1998)).

the second *Brady* factor "does not require the government to disclose all evidence in its possession that might assist defense preparation." *U.S. v. Middlemiss*, 217 F.3d 112, 123 (2d Cir. 2000). Ultimately, "evidence is not 'suppressed' if the defendant either knew, or should have known, of the essential facts permitting him to take advantage of any exculpatory evidence." *U.S. v. LeRoy*, 687 F.2d 610, 618 (2d Cir. 1982), *cert. denied*, 459 U.S. 1174 (1983); *see also U.S. v. Diaz*, 922 F.2d 998, 1007 (2d Cir. 1990) ("There is no improper suppression within the meaning of *Brady* where the facts are already known by the defendant.").

The scope of *Brady*'s materiality requirement is essentially "defined retrospectively, by reference to the likely effect that the suppression of particular evidence had on the outcome of the trial." *U.S. v. Coppa*, 267 F.3d 132, 139-40 (2d Cir. 2001). "The touchstone of materiality is a reasonable probability of a different result... a probability sufficient to undermine confidence in the outcome." *DiSimone v. Phillips*, 461 F.3d 181, 196 (2d Cir. 2006) (quoting *U.S. v. Madori*, 419 F.3d 159, 169 (2d Cir. 2005), *cert. denied*, 456 U.S. 1115 (2006); *U.S. v. Bagley*, 473 U.S. 667, 682 (1985)). Thus, "materiality in this context presents... a mixed question of law and fact," requiring a probabilistic determination as to the likelihood of a different outcome had the purportedly suppressed evidence been properly

disclosed to the defense. *Madori*, 419 F.3d at 169.

Chepe's testimony was neither actually suppressed nor material under the *Brady* doctrine. Petitioner knew, or most certainly should have known, about Chepe's involvement in the heroin-importation conspiracies and therefore the potential relevance of his testimony. The government from the outset identified Chepe, petitioner's brother, as petitioner's co-conspirator in the affidavit supporting petitioner's arrest warrant. Further, Chepe in fact pled guilty to his involvement in the heroin-importation conspiracies. Since petitioner undoubtably knew about Chepe's involvement in the conspiracies for which petitioner was convicted, there was no suppression within the meaning of *Brady*. *See LeRoy*, 687 F.2d at 618; *Diaz*, 922 F.2d at 1007.

Even assuming that Chepe's testimony would have been favorable to petitioner, its absence did not result in prejudice to petitioner. As discussed above, because Chepe's statements seek to exculpate his brother at no cost to himself and without any explanation refuting his co-conspirators' mutually corroborative testimony, no reasonable juror could credit Chepe's conclusory assertions to the point of acquitting petitioner in light of the substantial evidence against him. *See Aiello*, 814 F.2d at 113. Since there is no reasonable probability of a different verdict even had Chepe's testimony been introduced at

trial, that evidence is not material under *Brady. See Coppa*, 267 F.3d at 139-40; *DiSimone*, 461 F.3d at 196.

Petitioner's claim that the government withheld exculpatory employment records from him is equally unavailing. First, it is not facially evident that the employment records are actually favorable to petitioner. Since they comport with the cooperating witnesses' accounts of petitioner's involvement in the narcotics-related conspiracies, they may be read to reinforce the evidence against him.

More important, the employment records were not in fact suppressed. Petitioner was well aware of Mr. Alexander's relevance to his defense and could have contacted him at petitioner's former work address. Furthermore, the government provided all of the employment records in its possession to petitioner's counsel in compliance with its discovery obligations. Government Brief ("Gov't. Br.") Exhibit C, Letter from AUSA D. Wenner to J. Pittell, Esq., § 3.1. (Mar. 17, 2004). Notably, those records were introduced during the evidentiary hearing establishing petitioner's fugitive status, which tolled the applicable statute of limitations. Hr'g at 26-32. Petitioner therefore both knew about the relevant evidence and was provided with it by the government, negating any contention based on suppression under *Brady*. *See Strickler*, 527 U.S. at 282; *LeRoy*,

687 F.2d at 618.[16]

Moreover, as with Chepe's statement, petitioner's employment records are not material within the meaning of *Brady*. Since the employment records fail substantively to conflict with the evidence upon which the jury convicted petitioner, even had they been introduced at trial, there is no reasonable probability of a different result. *See Coppa*, 267 F.3d at 139-40; *DiSimone*, 461 F.3d at 196.

Petitioner argues that an evidentiary hearing is required in order to resolve his suppression of evidence claim. Since petitioner fails to establish a "plausible claim" that the government suppressed evidence in violation of *Brady*, an evidentiary hearing is not warranted. *Armienti*, 234 F.3d at 823.

## D. Ineffective Assistance of Counsel

Lastly, petitioner asserts seven claims under the rubric of ineffective assistance of counsel, arguing that counsel failed: (1) to advise petitioner of his right to testify in his own

---

[16] Petitioner, in his reply to the government's memorandum in opposition to his § 2255 motion, attempts to reinforce his contention that the government failed to provide him with his employment records by producing a letter, dated May 24, 2005, from petitioner's counsel D. Zapp to AUSA D. Wenner again requesting petitioner's employment records. Pet'r. Rep. Attachment C. As an initial matter, as discussed above, arguments raised for the first time in a reply memorandum need not be addressed. *Gigante*, 39 F.3d at 50 n. 2; *Shalala*, 71 F.3d at 1066 n. 2. Additionally, the letter conflicts with those produced by the government in their motion in opposition, and present in the court record, outlining the governments provision of petitioner's employment records in compliance with its *Brady* obligations in March 2004. Gov't. Br. Exhibit C. Regardless, since petitioner's employment records were central to the evidentiary hearing establishing his fugitive status held on June 23, 2004, petitioner and his counsel were aware of and had access to petitioner's employment records, rendering the additional letter included in petitioner's reply irrelevant and petitioner's claim of suppression meritless.

defense; (2) to present specifically requested evidence in the defense case; (3) to object at trial to the introduction of certain coconspirator statements inadmissible pursuant to *Crawford v. Washington*, 451 U.S. 36 (2004); (4) to object to improper comments during the government's summation; (5) to request that the Court charge the jury that one cannot conspire with a government agent or actor; (6) to object to the Court's improper handling of a jury note; and (7) to address the Court's misapplication of U.S.S.G. § 3B1.1(b) at sentencing.[17] Petitioner further claims that these errors cumulatively rendered his trial counsel's performance ineffective. Pet'r. Br. at 17-24.

A claim of ineffective assistance is never procedurally defaulted in a § 2255 proceeding, regardless of whether petitioner raised, or could have raised, the claim on direct appeal. *Massaro v. U.S.*, 538 U.S. 500, 509 (2003) ("Failure to raise an ineffective-assistance-of-counsel claim on direct appeal does not bar the claim from being brought later... under § 2255."). Nevertheless, petitioner's claims fail on the merits.

In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court established a two-part test defining "ineffective assistance of counsel" within a defendant's Sixth Amendment right

---

[17] Petitioner also asserts that counsel's failure to raise the claims contained in the instant petition constituted ineffective assistance of counsel. Pet'r. Br. at 17 n.5. Since I have already concluded that these claims are without merit, they need not be reexamined under the rubric of ineffective assistance of counsel.

to representation during a criminal trial. The *Strickland* test requires that the defendant show both (1) "that counsel's representation fell below an objective standard of reasonableness" and (2) "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 688, 694; *see also Torres v. Donnely*, 554 F.3d 322, 325 (2d Cir. 2009). "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686.

To satisfy the first prong of the *Strickland* test, a defendant must establish that counsel's conduct fell below an objective standard of reasonably effective assistance. *Strickland*, 466 U.S. at 687-88. Objective unreasonableness "must involve some increment of incorrectness beyond error." *Mosby v. Senkowski*, 470 F.3d 515, 519 (2d Cir. 2006), *cert. denied*, 128 S.Ct. 75 (2007) (citing *Sellan v. Kuhlman*, 261 F.3d 303, 315 (2d Cir. 2001)). The defendant must show "a course of action (or inaction) that seems risky, unorthodox or downright ill-advised." *Tippins v. Walker*, 77 F.3d 682, 686 (2d Cir. 1996). *Strickland*'s reasonableness standard is thus bounded by "the wide range of professionally competent assistance." *Strickland*, 466 U.S. at

690. Furthermore, "in gauging the deficiency, the court must be highly deferential [to counsel's trial strategy], must consider all the circumstances, must make every effort to eliminate the distorting effects of hindsight, and must operate with a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Lynn v. Bliden,* 443 F.3d 238, 247 (2d Cir. 2006) (quoting *Lindstadt v. Keane*, 239 F.3d 191, 198-99 (2d Cir. 2001), *cert. denied*, 549 U.S. 1257 (2007); *Strickland*, 466 U.S. at 688-90) (internal quotations omitted). Since "counsel is strongly presumed to have exercised reasonable judgment in all significant decisions," *Murden v. Artuz*, 497 F.3d 178, 198 (2d Cir. 2007), *cert. denied*, 128 S.Ct. 1083 (2008), the Court should not "second guess" the decisions of counsel that might be considered "sound trial strategy." *Strickland*, 466 U.S. at 689 ("strategic choices... are virtually unchallengeable"); *see also Keiser v. New York*, 56 F.3d 16, 16 (2d Cir. 1995). Accordingly, in assessing counsel's performance, a court "must conduct an objective review, measured for reasonableness under prevailing professional norms, which includes a context-dependent consideration of the challenged conduct as seen from counsel's perspective at the time." *Wiggins v. Smith*, 539 U.S. 510, 523 (2003) (quoting *Strickland*, 466 U.S. at 688-89)(internal quotations omitted).

The second prong of the *Strickland* test requires a showing

of actual prejudice. *Strickland*, 466 U.S. at 693. "The level of prejudice the defendant need demonstrate lies between prejudice that had some conceivable effect and prejudice that more likely than not altered the outcome in the case." *Lindstadt*, 239 F.3d at 204. Thus, the defendant must show that there is a "reasonable probability" that, but for counsel's objectively unreasonable conduct, the result would have been different. *Strickland*, 466 U.S. at 694. "Reasonable probability" is defined as "one that undermines confidence in the outcome." *Lindstadt*, 239 F.3d at 204 (citing *Strickland*, 466 U.S. at 694). Since an ineffectiveness claim requires "consider[ing] the totality of the evidence," *Strickland*, 466 U.S. at 695, "overwhelming" evidence of guilt may negate the possibility of actual prejudice. *Wise v. Smith*, 735 F.2d 735, 739 (2d Cir. 1984).

"There is no reason for a court deciding an ineffective assistance claim... to address both components of the inquiry if the defendant makes an insufficient showing on one." *Strickland*, 466 U.S. at 697; *see also Hemstreet v. Greiner*, 491 F.3d 84, 91 (2d Cir. 2007), *cert. denied*, 128 S.Ct. 962 (2008). Accordingly, a court may decline to consider the prejudice prong if a defendant failed to demonstrate that counsel performed below an objective standard of reasonableness. *See U.S. v. Vegas*, 27 F.3d 773, 778 (2d Cir. 1994), *cert. denied*, 513 U.S. 911 (1994). More likely, since "it is easier to dispose of an ineffectiveness

claim on the ground of lack of sufficient prejudice," a court may address the prejudice prong without resolving whether counsel's performance was deficient. *Strickland,* 466 U.S. at 697*.*

## 1. Failure to Advise Petitioner of Right to Testify

Petitioner contends that his defense counsel failed to advise him of his right to testify, thereby demonstrating deficient performance constituting ineffective assistance of counsel. Pet'r. Br. 17; Pet'r. Rep. 29 n. 9, 32. A defendant's constitutional right to testify in his own defense is considered fundamental and personal, relinquished only by the defendant himself. *Brown v. Artuz*, 124 F.3d 73, 77-78 (2d Cir. 1997), *cert. denied*, 522 U.S. 1128 (1998). Thus, "the decision whether to testify belongs to the defendant and may not be made for him by defense counsel." *Id.* Defense counsel bears responsibility for advising the defendant concerning the exercise of this right. *Id.* at 79. At the same time,

> a barebones assertion by a defendant, albeit made under oath, is insufficient to require a hearing or other action on his claim that his right to testify in his own defense was denied him. It just is too facile a tactic to be allowed to succeed. Some greater particularity [and also] some substantiation is necessary to give the claim sufficient credibility to warrant a further investment of judicial resources in determining the truth of the claim.

*Chang v. U.S.*, 250 F.3d 79, 84-85 (2d Cir. 2001). The Court may therefore choose a middle road between summarily dismissing the petitioner's claim and holding a full testimonial hearing in

resolving such a claim. *Id.* at 86. Furthermore, actual prejudice must have resulted from the defendant's failure to testify on his own behalf to substantiate the claim of ineffectiveness. *Strickland*, 466 U.S. at 693.

Petitioner offers no evidence in support of his claim that counsel failed to advise him of his right to testify on his own behalf. Again, he expects the Court to rely on his self-serving and conclusory allegation that his defense attorneys failed to advise him of his right to testify. The trial record demonstrates, however, that defense counsel vigorously represented petitioner. See Tr. 202, 253-55, 257-261, 278-79, 416-18, 421-22, 428, 449-54, 459-61, 485-87, 596-613, 757-61, 764-66, 773-79 (showing objections, pointed cross-examination, and competent summation). While summary dismissal of petitioner's claim may be inappropriate, his conclusory assertion is insufficient to substantiate an ineffectiveness claim or warrant an evidentiary hearing. *Chang*, 250 F.3d at 84-86. The totality of the trial record, set against the absence of evidence adduced by petitioner in support of this claim, renders the claim meritless.

Moreover, regardless of counsel's purportedly deficient performance, petitioner cannot exhibit actual prejudice resulting from his failure to testify on his own behalf, as his testimony almost certainly would not have altered his trial's outcome. *See Rega v. U.S.*, 263 F.3d 18, 22, 26 (2d Cir. 2001), *cert. denied*,

534 U.S. 1096 (2002) (defense counsel's refusal to let defendant testify did not constitute prejudice where defendant's "testimony would have been severely undermined by impeachment evidence," would have opened the door to damaging cross-examination, and where it generally "would have done more harm than good"). Petitioner's testimony - which, as demonstrated by his affidavit appended to the present motion, would have largely consisted of denial of his involvement in the heroin-importation conspiracies unsupported by additional evidence - would have been subjected to cross-examination, opened the door to impeachment, and contrasted starkly with contradictory testimony from the three, mutually corroborative, cooperating witnesses and with documentary evidence. Therefore, there is no reasonable probability that petitioner's testimony would have in any way affected the outcome of his trial.

## 2. Failure to Present Evidence

Petitioner claims that his counsel was ineffective when, contrary to his specific request, they failed to present the evidence appended to the present motion at trial. This claim fails to satisfy either prong of the *Strickland* test.

The decision of whether to offer certain evidence at trial is a classic example of trial strategy. *See Keiser*, 56 F.3d at 18 ("actions or omissions by counsel that might be considered sound trial strategy do not constitute ineffective assistance"). Since

"counsel is strongly presumed to have exercised reasonable judgment" within the scope of sound trial strategy, *Murden*, 497 F.3d at 198, "strategic choices are virtually unchallengeable." *Strickland*, 466 U.S. at 698. More specifically, the decision whether to call witnesses on behalf of a defendant is typically a question of trial strategy that courts will not second-guess. *See U.S. v. Smith*, 198 F.3d 377, 386 (2d Cir. 1999) ("The decision whether to call any witnesses on behalf of the defendant, and if so which witnesses to call, is a tactical decision of the sort engaged in by defense attorneys in almost every trial.") (quoting *U.S. v. Eisen*, 974 F.2d 246, 265 (2d Cir. 1992)). Furthermore, any ineffective assistance claim must also demonstrate a reasonable probability of actual prejudice as to the trial's outcome. *Strickland*, 466 U.S. at 694.

Petitioner cannot demonstrate that his counsel acted unreasonably in making the tactical choice not to introduce the evidence appended to the instant petition, namely petitioner's and Chepe's testimony and petitioner's employment records. As discussed above, the jury likely would have viewed petitioner's and Chepe's self-serving and conclusory statements with skepticism, especially in light of the mutually corroborative testimony of the three cooperating witnesses and the totality of the documentary evidence offered to show petitioner's guilt. Moreover, petitioner's employment records, as summarized in Mr.

Alexander's declaration, do not conflict with the inculpatory evidence and may be read to reinforce it. Accordingly, petitioner's counsel acted well within the bounds of reasonable conduct in electing not to offer evidence which would not have helped, but may in fact have harmed, petitioner's defense.

Regardless, petitioner's "new evidence" does not establish a reasonable probability that, but for counsel's purportedly unreasonable conduct, the result would have been different. *See Strickland*, 466 U.S. at 694. Petitioner's and Chepe's testimony would have stood in stark contradiction to the testimony of each of the three cooperating witnesses, who together gave a compelling and consistent account of both petitioner's and Chepe's participation in the conspiracies. Chepe's testimony, which seeks to exculpate his brother at no cost to himself and without any explanation refuting his co-conspirators' mutually corroborative testimony, would have been particularly ineffectual. Further, even if the "new evidence" indicated that, for example, petitioner was in New York when one of the cooperating witnesses testified that he was in Colombia, the jury would have most likely and reasonably attributed the discrepancy to a mistake of recollection rather than an intentional falsehood. Thus, even had the evidence been introduced, it would not have altered the trial's outcome.

## 3. Failure to Object to *Crawford* Violation

Petitioner claims that his counsel's failure to object at trial to the introduction of coconspirator statements by non-testifying declarants, specifically Chepe and Gisella Ariles of Costamar Travel Agency, was unreasonable as it violated his right to confrontation described in *Crawford v. Washington*, 541 U.S. 36 (2004). Petitioner's claim is meritless.

*Crawford* "substantially altered... Confrontation Clause jurisprudence." *U.S. v. Saget*, 377 F.3d 223, 226 (2d Cir. 2004), *cert. denied*, 543 U.S. 1079 (2005). The Sixth Amendment's Confrontation Clause provides that, "in all criminal prosecutions, the accused shall enjoy the right... to be confronted with the witnesses against him." U.S. Const. amend. VI. In *Crawford*, the Supreme Court "divided out-of-court [witness] statements into two categories, those that are testimonial in nature and those that are not." *Mungo v. Duncan*, 393 F.3d 327, 335 (2d Cir. 2004), *cert. denied*, 544 U.S. 1002 (2005). "Testimonial statements of witnesses absent from trial [are] admitted only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine." *Crawford*, 541 U.S. at 59. On the other hand, as the Supreme Court made clear in *Davis v. Washington*, 547 U.S. 813, 824-26 (2006), "the Confrontation Clause simply has no application to nontestimonial statements." *U.S. v. Feliz*, 467 F.3d 227, 231 (2d Cir. 2006), *cert. denied*, 549 U.S. 1238 (2007)

(citing *Davis*, 547 U.S. at 824). Thus, the primary inquiry under the Confrontation Clause addresses whether the statement is testimonial. "If so, the Confrontation Clause requirements of unavailability and prior opportunity for cross-examination apply." *Feliz*, 476 F.3d at 232; *see also Crawford*, 541 U.S. at 68. If not, the *Crawford* Confrontation Clause analysis is irrelevant. *See U.S. v. Goldstein*, 442 F.3d 777, 785 (2d Cir. 2006).

The Supreme Court declined to "spell out a comprehensive definition of 'testimonial.'" *Crawford*, 541 U.S. at 68. Yet, it noted that the term "applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial, and to police interrogations," *Crawford*, 541 U.S. at 68, and illustrated "formulations" of the "core class" of testimonial statements:

> Ex parte in-court testimony or its functional equivalent - that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially; extrajudicial statements contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions; statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.

*Crawford*, 541 U.S. at 51-52. "Thus, the types of statements cited by the Court as testimonial share certain characteristics; all

involve a declarant's knowing responses to structured questioning in an investigative environment or a courtroom setting where the declarant would reasonably expect that his or her responses might be used in future judicial proceedings." *Saget*, 377 F.3d at 228. Accordingly, the "determinative factor" in deciding whether a statement is testimonial "is the declarant's awareness or expectation that his or her statements may later be used at trial." *Id.*

Since none of the statements which petitioner alleges were admitted in violation of *Crawford* are testimonial, none violate his right to confrontation. Petitioner first identifies three statements made by Chepe which were offered via Deschamps' and Pavez's testimony.[18] All three were made by Chepe to coconspirators during the course of a criminal conspiracy, not in an investigative environment or courtroom setting. Such statements belie "the declarant's awareness or expectation that his or her statements may later be used at trial." *Saget*, 377 F.3d at 228. Accordingly, they are by definition nontestimonial. *Crawford*, 541 U.S. at 56 ("statements made in furtherance of a conspiracy" are "by their nature [] not testimonial"). Moreover, petitioner's counsel did in fact object when Deschamps and Pavez

---

[18] (1) Deschamps testified that Pavez confided to him that Chepe suspected petitioner was "skimming money of the top" of the heroin-smuggling business; (2) Pavez testified that Chepe instructed him to retrieve the heroin from petitioner in Colombia; (3) Pavez testified that Chepe informed him that petitioner originally proposed the heroin-importation scheme.

recounted these very statements. Tr. 182, 390-91.

Next, petitioner points to statements made by Ms. Ariles in a certification pursuant to Rules 803(6) and 902(11) of the Federal Rules of Evidence, explaining that the Costamar Travel Agency did not retain records for longer than five years. Tr. 645-46. Since Ms. Ariles's statements relate to the existence of business records, they are considered nontestimonial. *Crawford*, 541 U.S. at 56 ("business records" are "by their nature [] not testimonial"). Like statements between coconspirators in furtherance of a criminal conspiracy, business records are not maintained with the "awareness or expectation" that they "may later be used at trial," *Saget*, 377 F.3d at 228, marking them as outside the scope of testimonial statements covered by the Confrontation Clause.

Regardless, petitioner has nowhere demonstrated actual prejudice flowing from the jury's consideration of these statements. Excluding Chepe's statements would not have altered the balance of the evidence showing petitioner's guilt. Similarly, petitioner can point to nothing about the trial that would have changed had the Court excluded Ms. Ariles's certification. The detailed, parallel testimony of the cooperating witnesses, coupled with the documentary evidence arrayed against petitioner, overwhelm the limited impact of the statements under question. Thus, it is not reasonably probable

that, but for petitioner's counsel's allegedly unreasonable
failure to object to Chepe's and Ms. Ariles's statements, the
result of petitioner's trial would have been different. *See
Strickland*, 466 U.S. 694.

## 4. Failure to Object During Summation

Petitioner next argues that his counsel unreasonably failed
to object to the prosecution's purportedly improper comments
during summation. Pet'r. Br. 20-21. Specifically, petitioner
alleges that the government inappropriately vouched for
Villagomez's credibility by emphasizing his incentive to be
truthful, and that the government improperly "argued facts not
presented during trial" by highlighting Deschamps's demeanor
during cross-examination. Pet'r. Br. 20-21. Petitioner's argument
is without merit.

It is well established that the prosecution can neither
vouch for its witnesses' credibility nor express personal opinion
concerning the guilt of the accused. *U.S. v. Newton*, 369 F.3d
659, 681 (2d Cir. 2004), *cert. denied*, 543 U.S. 947 (2004); *U.S.
v. Miller*, 116 F.3d 641, 683 (2d Cir. 1997), *cert. denied*, 524
U.S. 905 (1998); *U.S. v. Young*, 470 U.S. 1, 18 (1985). "Such
comments can convey the impression that evidence not presented to
the jury, but known to the prosecutor, supports the charges
against the defendant and can thus jeopardize the defendant's
right to be tried solely on the basis of evidence presented to

the jury." *Young*, 740 U.S. at 18; *see also Newton*, 369 F.3d at 681. Vouching can further prejudice a defendant by inducing the jury to trust the government rather than its own evaluation of the evidence. *Newton*, 369 F.3d at 681; *see also Young*, 740 U.S. at 18. "In a particular context, however, what might superficially appear to be improper vouching for witness credibility may turn out on closer examination to be permissible reference to the evidence in the case." *U.S. v. Perez*, 144 F.3d 204, 210 (2d Cir. 1998). It is generally acceptable for the prosecution to avoid the concerns raised by improperly vouching by prefacing its arguments with "I submit." *See Newton*, 369 F.3d at 681-82; *Perez*, 144 F.3d at 210 (approving the use of "I submit" to urge the jury to reach certain conclusions based on the evidence, without thereby impermissibly interjecting into the proceeding government sponsorship or prosecution's personal beliefs). In the particular context of closing arguments, "counsel are entitled to broad latitude in the inferences they may suggest to the jury in summation," and "are free to make arguments which may be reasonably inferred from the evidence presented." *U.S. v. Roldan-Zapata*, 916 F.2d 795, 807 (2d Cir. 1990), *cert. denied*, 449 U.S. 940 (1991).

Petitioner identifies two instances of vouching by the prosecution during its rebuttal summation. Specifically, petitioner argues that the government improperly vouched for

Villagomez by arguing that he had an incentive to tell the truth because he was unaware of the government's corroboration of his testimony, and improperly vouched for Deschamps by pointing to his demeanor during cross-examination.[19] In both instances, the prosecutor employed the language "I submit" and otherwise remained well within the bounds of permissible argumentation. Tr. 789-91, 793-94; *see Newton*, 369 F.3d at 681-82; *Perez*, 144 F.3d at 210. In both cases, the allegedly improper statements followed the prosecution's permissible marshaling of the evidence articulating the incentives both witnesses had to testify truthfully. *See U.S. v. Rivera*, 22 F.3d 430, 438 (2d Cir. 1994) (alleged vouching not improper in light of defense summation that impugns the government's integrity or the credibility of its case, such as including fabricated testimony).

Petitioner also suggests that by arguing that Villagomez was

---

[19] Regarding the alleged vouching for Villagomez, the government stated during its rebuttal summation, "[Villagomez] has an incentive to tell the truth... If you tell a lie, the government figures it out... They checked up on that, they investigated. That's what government investigators do, they investigate things and found out he was not telling the truth. Mr. Villagomez is smart. If he tells a lie on the stand, he knows the government will catch him. His incentive is to tell the truth. Now, it's true that he lied in the past. He did... But ultimately he came around... And he said you now what, I'm going to tell you what really happened. And I submit to you, ladies and gentleman, that when he got on the witness stand, he told you what really happened... They don't know who else is testifying. They don't know what the other evidence is." Tr. 789-90, 793-94. Regarding the alleged vouching for Deschamps, the government stated during its rebuttal summation, "I submit to you, ladies and gentlemen, that Rodrigo Deschamps has no motive to lie. There was no testimony he was looking for anything. And remember, at the very last question [defense counsel] asked him... And you are testifying because the government promised you that if you... testified you wouldn't get deported, isn't that true. And Rodrigo looked at him almost in shock and said no, because that's not true." Tr. 791.

unaware of what evidence the government had corroborating his testimony, the government implied to the jury that it had extraneous evidence establishing petitioner's guilt. Pet'r. Br. 21 n.7. However, the prosecution never referred to corroborating evidence outside of the record; rather, the government argued that the travel records and witness testimony in the record themselves corroborated Villagomez's account, and further noted that Villagomez did not have access to the evidence corroborating his testimony. Tr. 714-15, 719-20, 728-29, 736-39, 794, 797. This argument is a reasonable assessment of the record evidence. *Roldan-Zapata*, 916 F.2d at 807.

Lastly, petitioner protests the prosecution's reference to Deschamps's demeanor and reaction during cross-examination, arguing that the reference is based on facts not in evidence. I disagree. A comment on a witness's demeanor and conduct during his examination is hardly based on extraneous evidence. The jury was present during the entirety of Deschamps's testimony and was free to disregard the prosecution's characterization of it. The government's recapitulation of the facts in summation did not suggest otherwise. *Roldan-Zapata*, 916 F.2d at 807; *Newton*, 369 F.3d at 681; *Young*, 740 U.S. at 18. Since petitioner fails to establish that the government made any improper comments or engaged in improper conduct, his counsel's failure to object cannot support a claim of ineffective assistance of counsel.

*Strickland*, 466 U.S. at 687-88, 697.

5. Failure to Request Jury Charge

Next, petitioner argues that his counsel's failure to ask the Court to charge the jury that one cannot conspire with a government agent or actor constitutes ineffective assistance of counsel. Pet'r. Br. 21. The facts of petitioner's case render this omission irrelevant.

Under 18 U.S.C. § 371, an agreement between only two actors, one of whom is a government agent, cannot constitute a conspiracy. 18 U.S.C. § 371. A coconspirator-turned-criminal informant qualifies as a government agent. *See U.S. v. Miranda-Ortiz*, 926 F.2d 172, 175 (2d Cir. 1991), *cert. denied*, 502 U.S. 928 (1991). At the same time, although a defendant cannot be convicted of a criminal conspiracy consisting *solely* of agents and informants, *see U.S. v. Goldberg*, 756 F.2d 949, 958 (2d Cir. 1985), *cert. denied*, 472 U.S. 1009 (1985), "the presence of such an agent does not destroy a conspiracy where at least two of the persons involved are private individuals." *U.S. v. Hurtado*, 47 F.3d 577, 586 (2d Cir. 1995), *cert. denied*, 516 U.S. 8903 (1995) (citing *Miranda-Ortiz*, 926 F.2d at 175).

While the government presented evidence that law enforcement officials arrested subordinate members of petitioner's heroin-importation conspiracy, who thereafter engaged in controlled deliveries of the heroin, leading to further arrests, none of

those deliveries formed the basis of the government's charges against petitioner. Petitioner was indicted on the basis of his conspiring with Chepe, Villagomez, Pavez, and Deschamps to import heroin into the United States for distribution. In fact, no evidence that petitioner ever met the individual couriers who agents arrested and who executed controlled deliveries was ever presented at trial. Consequently, nothing suggests that the jury may have mistakenly believed that petitioner conspired with these cooperating coconspirators after their arrests. Thus, the rule that a sole individual cannot conspire with a government agent or actor is irrelevant to petitioner's case.

Moreover, since petitioner's conspiracy involved at least two individuals who were not government agents, even had petitioner's conspiracy consisted of a direct agreement with the cooperating coconspirators, it would still have supported a conspiracy conviction. *Hurtado*, 47 F.3d at 586; *Miranda-Ortiz*, 926 F.2d at 175. Since petitioner fails to substantiate any reason to charge the jury that one person cannot conspire with a government agent or actor, his counsel's failure to request such a charge cannot constitute ineffective assistance. *Strickland*, 466 U.S. at 687-88, 697.

6. Failure to Object to Jury Note

Petitioner claims his counsel was ineffective for failing to object when the Court responded to a jury note by referring back

to its original instructions on reasonable doubt without stating that the instructions must be considered as a whole, with no specific emphasis on one portion of the instructions. Pet'r. Br. 22. Petitioner fails, however, to demonstrate why the Court's response to the jury's note was improper, and in any event, his claim is without merit.

"A trial court responding to a note from a deliberating jury is only required to answer the particular inquiries posed." *U.S. v. Rommy*, 506 F.3d 108, 126 (2d Cir. 2007), *cert. denied*, 128 S.Ct. 1681 (2008). Moreover, a response to a jury request "is a matter committed to the sound exercise of a trial court's discretion." *U.S. v. Young*, 140 F.3d 453, 456 (2d Cir. 1998).

The jury note stated as follows: "We, the jury, have come to a standstill. We are here unable to come to an unanimous decision." Tr. 881. The Court responded by giving the jury a summary charge as to employing reason and common sense with a view to reaching a unanimous conclusion as to whether the prosecution had proved its case beyond a reasonable doubt. Tr. 882-86. Since "a trial court responding to a note from a deliberating jury is only required to answer the particular inquiries posed," *Rommy*, 506 F.3d at 126, this response was squarely within the scope of "the sound exercise of a trial court's discretion." *Young*, 140 F.3d at 456. Supplementing that response by referring the jury back to the entirety of the

charge, even though the jury requested instruction only as to resolving their impasse, would have been unreasonable and excessive. Since petitioner fails to demonstrate any impropriety in the Court's response to the jury's note, his counsel's failure to object to the response cannot constitute ineffective assistance. *Strickland*, 466 U.S. at 687-88, 697.

## 7. Misapplication of § 3B1.1(b) at Sentencing

Finally, petitioner claims that the Court's misapplication of U.S.S.G. § 3B1.1(b) resulted in an unreasonable departure from the sentencing guidelines.[20] Petitioner's claim is meritless.

Section 3B1.1(b) of the United States Sentencing Guidelines (the "Guidelines") provides for a three-level upward-adjustment in a defendant's offense level "if the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(b). Based in part on petitioner's counsel's arguments, I found that petitioner's role in the conspiracies was similar to the role of his brother and coconspirator Chepe. Because Chepe received a three-point enhancement pursuant to U.S.S.G. § 3B1.1(b), I also enhanced

---

[20] Petitioner fails to articulate how his counsel could have been ineffective regarding the Court's purported misapplication of § 3B1.1(b). At times, petitioner appears to argue that his counsel was ineffective in generally advocating for a reasonable sentence. However, as petitioner raised the reasonableness of his incarceratory sentence on direct appeal, its consideration within the scope of the present § 2255 motion is inappropriate. *Davis*, 417 U.S. at 342.

petitioner's offense level by three points, rather than the four points sought by the government. Thus, petitioner's counsel succeeded in obtaining a reduction of the role enhancement from four to three points. Regardless, both the evidence presented at trial and the Pre-Sentence Report demonstrated that petitioner was at least a manager or supervisor, if not an organizer or leader, and that more than five people were involved in the criminal conspiracies. Accordingly, petitioner's contention that this court unreasonably applied § 3B1.1(b), and that his counsel was ineffective in his argument to the court on this issue, is entirely without merit.

8. Cumulation of Errors

Petitioner also argues that the cumulative effect of each of his objections to his counsel's performance was to render his counsel's assistance ineffective. As set forth above, however, each of petitioner's objections is without merit. Whether viewed individually or cumulatively, petitioner's arguments do not lead to the conclusion that his counsel rendered ineffective assistance, and accordingly, petitioner's claim fails.

**CONCLUSION**

For the reasons set forth above, both petitioner's request for an evidentiary hearing and motion to set aside or correct his conviction, pursuant to 28 U.S.C. § 2255, are denied. Petitioner

is denied a certificate of appealability because he has not made

a "substantial showing of the denial of a constitutional right."

*U.S. v. Outen*, 286 F.3d 622, 634 (2d Cir. 2002) (quoting 28

U.S.C. § 2253(c)(2)). The Clerk is hereby directed to transmit a

copy of the within to the parties and the Magistrate Judge.


SO ORDERED.

Dated:     Brooklyn, New York
           July 23, 2009

                    By: <u>/s/ Charles P. Sifton (electronically signed)</u>
                        United States District Judge